Kevin ALSTON and Sandra Alston, as
next friend of their minor daughter,
Ashley Alston, et al., Plaintiffs,

v.

VIRGINIA HIGH SCHOOL LEAGUE,
INC., Defendant.

No. CIV. A. 97–0095–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 13, 1999.

Mary Catherine Bauer, ACLU of Virginia Foundation, Richmond, VA, Deborah C. Waters, Rutter & Montagna, L.L.P., Norfolk, VA, Kristen Galles, Alexandria, VA, for plaintiffs.

James M. Johnson, Robert Craig Wood, McGuire, Woods, Battle & Boothe, Charlottesville, VA, for defendant.

### MEMORANDUM OPINION

MICHAEL, Senior District Judge.

#### I.

Before the court are three motions, two that the plaintiffs filed in this case and one that the defendant filed. First, on August 2, 1999, the defendant filed a "Motion for Summary Judgment" in accordance with Federal Rule of Civil Procedure 56(b), on both claims found in the plaintiffs' complaint. Second, also on August 2, 1999, the plaintiffs filed a "Motion for Declaratory Judgment," which this court construes as a motion for partial summary judgment. The motion asks this court to find that (1) the Virginia High School League ("VHSL") is an entity subject to liability under Title IX of the Education Amendments and (2) that the VHSL is a "state actor" within the meaning of the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1983. Finally, together with the motion for declaratory judgment, the plaintiffs filed a "Motion in Limine to Exclude Evidence," seeking to exclude from admission into evidence the survey conducted by the Center for Survey Research on behalf of the VHSL. For the reasons discussed below, the court denies the defendant's motion for summary judgment, denies the plaintiffs' motion for declaratory judgment, construed as a motion for partial summary judgment, and denies the plaintiffs' motion in limine.

#### II.

FACTS

On August 19, 1997, plaintiffs, as next friends of their minor daughters, brought this action under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983, alleging that the defendant has denied certain female athletes in the Commonwealth of Virginia's public high schools equal treatment, opportunities and benefits based on their sex in violation of Title IX and the Equal Protection Clause of Amendment XIV of the United States

Constitution. Plaintiffs bring their Title IX claim pursuant to 20 U.S.C. § 1681 *et seq.*, for which jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343(3)-(4). Their claim under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment is also brought in federal district court pursuant to the jurisdictional grant at 28 U.S.C. §§ 1331, 1343(3)-(4). The court has jurisdiction to grant declaratory and other relief pursuant to 28 U.S.C. § 2201.

Plaintiffs in this action are the parents of minor girls enrolled in various public high schools in Virginia. The defendant, the VHSL, administers interscholastic athletic competition in Virginia and is an incorporated association whose members are 288 public high schools. These schools pay membership dues, which are one source of revenue for the VHSL. Each school has one vote in league governance, exercised through its principal, and member schools are recipients of federal funds. An executive committee, which has the power to formulate bylaws, rules, and regulations, controls the VHSL. The executive committee consists of twelve public high school principals, eight public school division superintendents, three public school athletic directors, along with two members of the Virginia Assembly and one member of the Virginia Department of Education. Decisions of the executive committee, however, are subject to review and alteration by the full membership at the biannual meetings.

The plaintiffs allege that the VHSL's system of scheduling athletic seasons constitutes intentional sex discrimination against certain female athletes. Specifically, plaintiffs assert that the VHSL's scheduling practices treat boys' sports differently than girls' sports, forcing some girls to stop playing sports they previously were able to play while no boys are ever forced to stop playing sports solely because of scheduling changes. The VHSL uniformly schedules boys' sports such that they play each sport in the same season across the A, AA and AAA divisions, which correspond to school size. Boys' basketball, for example, is played during the winter season at all public schools regardless of division classification. The schedule for girls' sports, however, varies depending on the division classification of the school. For example, girls' basketball is played in the fall for divisions A and AA schools, but in the winter for division AAA.[1]

Plaintiffs argue that upon reclassification into a new division, some female high school athletes who play multiple sports are forced to give up sports they previously played due to the scheduling conflict newly created by reclassification.[2] Reclassification of a school from one division to another has the effect of changing the seasons in which certain girls' sports are played at a school, such that some girls' sports, previously scheduled in different seasons, now occur in the same season. For example, at a school that is reclassified from AA to AAA, field hockey and volleyball, previously played in two different seasons, would be played in the same season. The newly-created conflict due to reclassification would force girls who previously were able to play both field hockey and volleyball in their respective seasons

---

**1.** The underlying reason for this difference in scheduling the seasons for boys' and girls' sports is a disputed fact in the case, although the court has received some evidence that the scheduling practice was in response to the limited availability of school athletic facilities, particularly during the inception of girls' athletics.

**2.** Reclassification occurs every two years based on changes in enrollment numbers at the schools across the state. An average of ten schools are reclassified every two years. In theory, the same school could be reclassified twice within four years.

to give up one or the other because only one sport may be played in each season. The girls' sports for which the seasons could change after reclassification are basketball, tennis and volleyball. No boys' sports change season after reclassification because boys' sports are played in the same season regardless of the school's division.

The plaintiffs allege that the combined effect of the VHSL's scheduling of girls' and boys' sports and its periodic reclassification of schools is discriminatory because after reclassification, no boys' sports change season as girls' sports do. No male high school athletes face the same dilemma as these plaintiffs because the season for each boys' sport is uniform across the A, AA and AAA divisions. However, all students must select their sports taking into account the seasons in which sports are played; and, as noted, no boy or girl student-athlete may play two sports that occur in the same season. The difference for the girls is that, after they have made their selection once based on the current seasons in which sports are played at their school, they may have to revise their selection upon reclassification, when those seasons change. Therefore, when a school is reclassified, its male athletes can continue playing the sports they previously selected, while some of its female athletes may have to give up one or more sports. Giving up a sport they had already played for one or more years in high school is the asserted disadvantage imposed on girls but never on boys under the VHSL's scheduling system. This unequal treatment, the plaintiffs claim, constitutes a violation by the VHSL of Title IX and the Equal Protection Clause.

## III.

DISCUSSION

The defendant moves this court for summary judgment on both claims stated in the plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 56(b). Regarding the plaintiffs' Title IX claim, the VHSL contends that it is not subject to liability under Title IX because it is not a recipient of federal funds. It also states that the plaintiffs have not shown sufficient evidence to justify an implied, private right of action for damages under Title IX, nor sufficient evidence of disparate impact to a large enough number of female students as a result of the VHSL's scheduling practices, or of any loss in participation opportunities for female athletes as defined by Title IX. The VHSL also contends that the plaintiffs cannot sue individually for unequal treatment under the VHSL athletics program. In reference to the plaintiffs' second claim under the Equal Protection clause of the Fourteenth Amendment, the VHSL states that it is not subject to liability under the Equal Protection clause and 42 § U.S.C.1983 because it is not a state actor. Also, the VHSL contends that the plaintiffs have not set forth any evidence that its scheduling rules are not facially gender neutral or were promulgated or reaffirmed because of their alleged adverse impact on female athletes.

The plaintiffs, on the other hand, as expressed in their motion for declaratory judgment, wish for this court to pronounce that the VHSL is an entity subject to liability under Title IX and that it is a "state actor" within the meaning of the Equal Protection clause and 42 U.S.C. § 1983. This court construes the plaintiff's declaratory judgment motion as a motion for partial summary judgment. The court construes the motion as such so that it is able to reach the issues involved without paying too close attention to the niceties of pleading. The plaintiffs also seek to exclude from admission into evidence

the survey conducted by the Center for Survey Research on behalf of the VHSL because it is being used for an improper purpose and is inadmissible hearsay.

## A.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). Issues of material fact are genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the facts and draw all inferences in the light most favorable to the nonmoving party. *See id.* Also, the nonmoving party is entitled to have the credibility of all its evidence presumed. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990). The movant has the burden of showing the absence of evidence to support the nonmovant's case before the nonmoving party must demonstrate the existence of some triable issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). There must be more than "a mere scintilla" of evidence to support the other party's case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## B.

### TITLE IX CLAIM

Congress enacted Title IX of the Education Amendments and analogous civil rights statutes to prohibit discrimination in federally funded programs. Specifically, Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (1994). The Department of Health, Education, and Welfare (HEW) promulgated regulations implementing this nondiscrimination principle when Congress enacted Title IX in 1972. *See* 34 C.F.R. § 106.1–.71 (1998). The regulations define the term "recipient" as:

> [A]ny State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. § 106.2(h). Therefore, an entity does not have to be a direct recipient of federal funds, but can also be an entity or organization that receives federal assistance "through another recipient." *Id.* There is no dispute over whether the VHSL receives federal funds directly. Most of its revenue is derived from insurance premiums, membership dues, fees, gate receipts from events, and corporate sponsorships, and thus it does not receive federal funds directly from any entity. However, the plaintiffs have the burden to prove whether the VHSL receives federal financial assistance indirectly or "through another recipient," that is, through the

member schools, all of whom receive federal funds and who pay membership dues to the VHSL.

In *NCAA v. Smith,* the Supreme Court held that the NCAA was not subject to Title IX liability on the basis of its receipt of dues from federally funded member schools. 525 U.S. 459, 119 S.Ct. 924, 929–30, 142 L.Ed.2d 929 (1999). In *Smith,* there was no allegation that the member schools paid their dues to the NCAA with federal funds earmarked for that purpose, thus leading the Court to conclude that the NCAA was neither a direct nor an indirect recipient of federal funds. *Id.* at 929. The same is true in the present case—the plaintiffs have not alleged that the member schools of the VHSL pay their dues with federal funds earmarked for that purpose. Under *Smith,* therefore, the VHSL is not subject to liability under Title IX solely by virtue of the fact that it receives membership dues from the high schools that do receive federal funds.

The Court, however, declined to "address alternative grounds" that the plaintiff had asserted in her brief to the Supreme Court. *Id.* at 926, 930. Smith advanced the argument that "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless whether it is itself a recipient." *Id.* at 930. The Court ruled only on the issues that the courts below had decided and thus it did not decide whether the NCAA might be covered under Title IX because its member colleges and universities, who receive federal funds, have ceded controlling authority over intercollegiate athletics to the NCAA. *Id.*

The plaintiffs argue that the question left unanswered in *Smith* is a key question to be asked in the present case. In addition to their argument that the VHSL indirectly receives federal funds, the plaintiffs assert that because the VHSL is comprised of representatives of its member schools, all of which are public secondary schools in Virginia and all of which are federally funded and subject to Title IX themselves, and because the VHSL controls the schools' sports programs by consent of the schools and the Virginia Department of Education, it is subject to liability under Title IX. The plaintiffs cite two lower court cases, decided prior to the Supreme Court's decision in *Smith,* that support their position. Both the Sixth Circuit and the Eastern District of Tennessee have held that a state high school athletic association is a recipient of federal funds and is subject to liability under the civil rights acts because a direct fund recipient delegated to it the supervision of the state's interscholastic athletic programs. *See Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265, 272 (6th Cir.1994); *Graham v. Tennessee Secondary School Athletic Ass'n,* 1995 WL 115890, at *11 (E.D.Tenn.1995). However, these two cases can be distinguished from the case at hand because they involve state high school athletic associations that were expressly delegated their authority by state regulation.

However, subsequent to *Smith,* the United States District Court for the Eastern District of Pennsylvania in *Cureton v. NCAA* took up the issue that Smith had brought up in her brief to the Supreme Court—when a recipient cedes controlling authority over a federally funded program to another entity, is the controlling entity subject to liability under a civil rights statute regardless whether it is itself a recipient? 37 F.Supp.2d 687, 694–96 (E.D.Pa. 1999). The court in *Cureton* decided that "the NCAA is subject to suit under Title VI, irrespective of whether it receives fed-

eral funds, directly or indirectly, because member schools (who themselves indisputably receive federal funds) have ceded controlling authority over federally funded programs to the NCAA." *Id.* at 694. Although *Cureton* deals with the question of whether the NCAA is liable under Title VI, it is equally applicable to a Title IX case because:

> Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefitted class.... The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.

*Id.* at 693 (*citing Cannon v. University of Chicago*, 441 U.S. 677, 694–96, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

The court in *Cureton* acknowledged that the plaintiffs in the case could not rely solely on the NCAA's receipt of dues from members who receive federal funds to show that it indirectly benefits from that federal assistance and thus is liable under Title VI. *See id.* However, the court pointed out that plaintiffs seeking to establish Title VI liability are not precluded from using this theory in combination with other facts or theories to prove that the NCAA receives federal funds "sufficient to trigger Title VI coverage." *Id.* The court found that the member colleges, which were recipients of federal financial assistance, had ceded controlling authority of a federally funded program to the NCAA, and so it is subject to Title VI regardless of whether itself is a recipient of federal funds. *See id.* at 694–95. The court also noted the "pivotal role" that an organization such as the NCAA plays in maintaining an athletic program. *Id.* at 695. In the present case, however, questions of fact remain as to whether the VHSL plays such a pivotal role in maintaining the Commonwealth's interscholastic athletics program.

As noted in the *Cureton* decision, an intercollegiate athletics program is of a "unique nature" and is "one of the few educational programs of a college or university that cannot be conducted without the creation of a separate entity to provide governance and administration." *Id.* Therefore, such programs require the NCAA to adopt legislation that each member of the NCAA agrees to abide by and enforce. *See id.* It remains to be seen whether an interscholastic high school athletic program is of an equally "unique nature" and whether interscholastic high school sports programs involve such cooperation between schools that they cannot function without common rules and a common administration, as provided by the VHSL. As the court in *Cureton* stated in reference to the NCAA, "the creation of this supervising association is not only necessary for the promotion of intercollegiate athletics, but the existence of that entity is merely a consequence of the inherent nature of the member institutions's intercollegiate athletics programs." *Id.* A question of fact remains as to whether the VHSL exists as a consequence of needing a common governance over interscholastic activities. The plaintiffs have the burden to prove whether, by agreeing to abide by the rules and regulations of the athletic association, the member high schools of the VHSL have transferred authority to the league just as member colleges and universities were deemed to have transferred authority to the NCAA in *Cureton*. Just as the plaintiffs in *Cureton* established that the member colleges and universities of the NCAA had granted to it "the authority to promulgate rules affecting intercollegiate athletics that the mem-

bers are obligated to abide by and enforce," thus bringing it "sufficiently within the scope of Title VI irrespective of its receipt of federal funds," the plaintiffs in the present case have to establish that the member schools of the VHSL have ceded to it the same type of authority, thus bringing it into the scope of Title IX. *Id.* at 696.

In addition to the parallels between *Cureton* and the present case, the Civil Rights Restoration Act of 1987 ("CRRA"), which was enacted to clarify the application of Title IX, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964, and to overturn the Supreme Court's 1984 decision in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), provides insight into the coverage of Title IX. The CRRA amends Title IX and the other civil rights statutes by adding a section that defines the phrase "program or activity" and "program" as used in the statutes. 20 U.S.C. § 1687 (1994). The definition makes it clear that "discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." S. REP. NO. 100–64, at 4 (1987). The CRRA defines "program or activity" and "program" as:

[A]ll of the operations of -

(1)(A) a department, agency, special purpose district, or other instrumentality of a State of a local government; or

. . . . .

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency . . ., system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship -

. . . . .

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

. . . . .

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance . . . .

20 U.S.C. § 1687. Therefore, under the CRRA, if any part of a secondary school system receives federal financial assistance, "all of the operations of the entire . . . school system are subject to the requirements of the four civil rights laws," including Title IX. S. REP. No. 100–64, at 17. A question remains as to whether the public secondary school systems of Virginia, which do receive federal financial assistance, have ceded controlling authority of its interscholastic athletic programs to the VHSL. While decision of this issue may ultimately be a matter of law for this court, an adequate factual foundation must first be developed. Therefore, this court does not now decide this issue.

The defendant asserts that the plaintiffs do not have a private action for damages because they have not forecast sufficient evidence that the VHSL's "deliberate indifference" caused their alleged Title IX damages. Title IX itself contains only administrative means of enforcement and does not contain an express private right of action for damages. *See* 20 U.S.C. § 1682 (1994). However, in *Franklin v. Gwinnett County Public Schools,* the Supreme Court concluded that a monetary damages remedy in an implied private action is available under Title IX. 503 U.S.

60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Subsequently, the Court has limited the availability of these damages to plaintiffs who can show intentional discrimination. *Davis v. Monroe County Board of Education,* 526 U.S. 629, 119 S.Ct. 1661, 1666, 143 L.Ed.2d 839 (1999); *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 291, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Recipients of federal funds can be liable in damages only "where their own deliberate indifference effectively 'caused the discrimination.'" *Davis,* 119 S.Ct. at 1671 (*citing Gebser,* 524 U.S. at 291, 118 S.Ct. 1989). *Gebser* and *Davis* were both sexual harassment cases; however, prior to those decisions, a district court recognized that the same standard applies to any Title IX private right of action for monetary damages. *See Pederson v. Louisiana State University,* 912 F.Supp. 892, 917–18 (M.D.La.1996). In *Pederson,* the court granted the defendant's motion for summary judgment on the plaintiffs' claim for monetary damages, finding that "monetary damages are not recoverable under Title IX absent a finding of intentional discrimination." *Id.* at 918.

█ As a sexual harassment case, *Davis* is factually distinguishable from the present case because it involves an actor and a decision-maker who, although both under the control of the entity covered by Title IX, are two different parts of the entity. In *Davis,* the Court decided that an entity covered by Title IX can be held liable in money damages for acts of a person under the control of the entity only if the entity's decision-maker knew of the discriminatory acts. *Davis,* 119 S.Ct. at 1666. In the present case, the VHSL and its executive committee are both the actor and the decision-maker. Therefore, if the VHSL and its executive committee intentionally discriminated against the plaintiffs by failing

to align the schedules of girls' sports across the classifications, it may be liable to the plaintiffs for money damages. In light of the evidence now before the court, whether the VHSL intentionally discriminated against the plaintiffs is a question of fact for the jury to decide at trial.

The defendant argues that "the record unequivocally establishes that VHSL attended to plaintiffs' claims of unfair treatment with a high degree of concern, and more than reasonable responsiveness" and therefore was not deliberately indifferent to any allegations of discrimination. (Def's. Mem. Supp. Summ. J. at 10.) Plaintiff Kevin Alston brought the asserted scheduling problem to the attention of the executive director of the VHSL, Ken Tilley, in the fall of 1995. (Tilley Aff. ¶ 6.) The defendant argues that this was the first time that it became aware of the scheduling problem brought about by reclassification and that from that point until Alston filed suit, the VHSL attempted to assist Alston in presenting his views and proposals. (Def's. Mem. Supp. Summ. J. at 10–11.) This evidence, along with evidence of rejected proposed bylaws that would have changed the seasons for girls sports to conform with the preferences of the plaintiffs, demonstrates, as the defendant contends, that no reasonable jury could find that the VHSL was deliberately indifferent to any alleged discrimination.

However, the plaintiffs contend that a reasonable jury could find that the VHSL was both aware of and indifferent towards the scheduling problem that caused the discrimination against the plaintiffs. In early 1993, then Governor of Virginia Lawrence Douglas Wilder endorsed and directed the Secretary of Education to "commence implementation" of the final recommendations of the Governor's Commission on Intercollegiate Athletics "through the appropriate state agencies

and affected organizations." (Letter from Governor Wilder to Secretary of Education Dyke of 1/8/93, at 1.) Recommendation 36 states:

> Local school divisions and the Virginia High School League should further reduce sports season variations by scheduling girls volleyball during the traditional fall season and girls basketball during the traditional winter season, regardless of school division size.

Report of Governor's Comm'n on Intercollegiate Athletics, at 17 (1993). Governor Wilder, in endorsing the Commission's recommendations, stated that "several recommendations clearly break new ground and will put Virginia on the cutting edge in athletic reform. This is particularly true with respect to the gender equity recommendations . . . ." (Letter from Governor Wilder to Secretary of Education Dyke of 1/8/93, at 1.) The governor also referred to such recommendations regarding gender equity as being "long overdue." *Id.* As Recommendation 36 is included in Chapter 3 titled "Summary Report: Gender Equity," a jury could reasonably conclude that the VHSL's indifference to the governor's recommendation was deliberate and discriminatory. Also, in concluding chapter three's discussion of the recommendations with regard to gender equity, the Governor's Report states:

> The requirements of Title IX are a reality and compliance with those requirements is a must. In order to ensure that both male and female student-athletes enjoy the many benefits of sports, the Commonwealth's educational institutions must acknowledge the legal and moral imperatives of gender equity. The recommendations of this committee are designed to help provide equitable access to athletics opportunities, benefits and services, and to comply with the legal requirements of gender equity.

Report of Governor's Comm'n on Intercollegiate Athletics, at 18–19 (1993). It is at least clear that the Governor's Commission intended the implementation of its recommendations to help Virginia and its sports organizations, such as the VHSL, to comply with Title IX, a law which has the primary aim is of ending gender discrimination in athletics. Although the report never makes explicit reference to ending discrimination through the aligning of at least two girls' sports seasons, a reasonably jury could interpret the Governor's Report as a measure promulgated to combat discrimination which the VHSL ignored. The question of whether the defendants intentionally discriminated against the plaintiffs thus giving them a right of action for monetary damages is a question of fact for the jury.

■ At oral argument, the parties conceded that the plaintiffs have narrowed their Title IX claim to discrimination by means of unequal treatment. The defendant's arguments that the plaintiffs have failed to forecast sufficient evidence that (1) the VHSL's athletic program disparately impacts sufficient female students to violate Title IX and (2) the VHSL has caused any "loss of opportunities" as defined by Title IX, are therefore irrelevant. The plaintiffs merely proffer the girls' testimony regarding having to give up a chosen sport as evidence that they were treated differently from male high school athletes.

Through its implementing regulations, Title IX covers three areas with regards to athletics: equitable scholarship funding, equal participation opportunities, and equal treatment. *See* 34 C.F.R. § 106.41 (1998). The plaintiffs' remaining Title IX claim is an unequal treatment claim under § 106.41(c)(3), "[s]cheduling of games and practice times." The defendant asserts that the plaintiffs' claim must fail as a

matter of law because the alleged unequal treatment is not substantial and system-wide. The VHSL asserts that this is the applicable standard based on expert opinion, the Office for Civil Rights ("OCR") manual used for Title IX investigations, and the December 11, 1979 Intercollegiate Athletics Policy Interpretation issued by the Department of Health, Education, and Welfare contained in the Federal Register. *See* Intercollegiate Athletics Policy Interpretation, 44 Fed.Reg. 71,413 (1979). The VHSL argues that because only a small portion of the female athletes end up having to give up a sport upon reclassification, it is only those girls that are subjected to the alleged unequal treatment.

The plaintiffs, however, assert that the alleged unequal treatment with regards to scheduling of games and practice times is system-wide. The only real question, the plaintiffs contend, is whether the unequal treatment is substantial. The plaintiffs argue that because forty to seventy girls have to chose between two sports every other year due to the differences in the scheduling of girls' sports, and because of the negative message that this sends to girls' teams, the impact of the unequal treatment is substantial. This is a question of fact for the jury. At trial, both parties will likely present expert witness testimony as to whether the impact of the differences in the scheduling of girls' sports has led to substantial unequal treatment. A reasonable jury could conclude that, as the plaintiffs contend, the unequal treatment is substantial. In the alternative, a reasonable jury could also conclude that such unequal treatment is not substantial. Therefore, it is not proper for the court to resolve this issue at this stage of the litigation.

Regarding the plaintiffs' Title IX claim, there remain multiple issues of material fact to be decided at trial, such as whether the VHSL is subject to liability under Title IX, whether the VHSL intentionally discriminated against the plaintiffs, whether the plaintiffs have a private right of action for damages, and whether the alleged unequal treatment of high school girls' sports with regard to the scheduling of seasons is substantial.

### C.

EQUAL PROTECTION CLAIM

The plaintiffs also claim that the VHSL has intentionally deprived them of their right to equal protection under the law as secured by the Fourteenth Amendment of the United States Constitution. Congress enacted 42 U.S.C. § 1983 as the statutory remedy for violations of the Constitution. It provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (1994 & Supp.1996). Therefore, for a defendant to be held liable under § 1983, "the conduct at issue must have occurred 'under color of' state law." *NCAA v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). In the present case, the plaintiffs' assert that the VHSL is a "state actor" within the meaning of the Equal Protection Clause and 42 U.S.C. § 1983 that has deprived the plaintiffs of their rights secured by the Constitution.

The Virginia Department of Education, its school districts, and its public schools

are all undeniably state actors. The plaintiffs contend that the question is whether the Commonwealth was sufficiently involved in the actions of the VHSL through the Virginia Department of Education and the member schools for the VHSL to be considered a state actor. The plaintiffs assert that the Commonwealth sufficiently was involved in the VHSL's actions because the Executive Committee of the VHSL, according to its bylaws, must include two members of the Virginia General Assembly and one member of the Virginia Department of Education, and because the member schools, all of which are public and are represented by their principals, delegate to the VHSL the authority to control and administer interscholastic athletics in Virginia. Whether this asserted involvement in the VHSL's actions is sufficient to constitute state action is a question of fact for the jury.

■ There is "no precise formula to determine whether otherwise private conduct constitutes 'state action.'" *Arlosoroff v. NCAA,* 746 F.2d 1019, 1021 (4th Cir.1984). Often, determinations of whether an entity has served as a state actor must be made on a case-by-case basis. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In *Lugar,* the Supreme Court inquired as to whether the conduct at issue was "fairly attributable to the State," that is, was there sufficient government involvement to constitute state action. 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Courts have also developed other tests to determine whether a party is a state actor or not. The "public function" test asks whether a private entity exercises powers that are "traditionally exclusively reserved to the state." *See Jackson v. Metropolitan Edison Co.* 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The "symbiotic relationship" or "nexus" test requires "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. 449.

■ The majority of the cases to address the issue of whether a state high school athletic association is a state actor have used a form of the "nexus" test in that they have concluded that associations like the VHSL are "so intertwined with the state that their actions are considered state action." *Clark v. Arizona Interscholastic Association,* 695 F.2d 1126, 1128 (9th Cir.1982); *see Alerding v. Ohio High School Athletic Association,* 779 F.2d 315, 316 n. 1 (6th Cir.1985); *Yellow Springs Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651, 653 (6th Cir.1981); *Brenden v. Independent School District 742,* 477 F.2d 1292, 1295 (8th Cir.1973); *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155, 1157 (5th Cir.1970); *Louisiana High School Athletic Association v. St. Augustine High School,* 396 F.2d 224, 227 (5th Cir.1968); *Gilpin v. Kansas State High School Activities Association,* 377 F.Supp. 1233, 1237 (D.Kan.1973); *Bucha v. Illinois High School Association,* 351 F.Supp. 69, 73 (N.D.Ill.1972). *But see Brentwood Academy v. Tennessee Secondary School Athletic Association,* 180 F.3d 758, 766 (6th Cir.1999), *reh'g en banc denied,* 190 F.3d 705 (6th Cir.1999); *Burrows v. Ohio High School Athletic Association,* 891 F.2d 122, 125 (6th Cir.1989).

In *Brentwood Academy,* however, the Sixth Circuit determined that the Tennessee Secondary School Athletic Association ("TSSAA") is not a state actor because the plaintiff failed to establish that its actions are "fairly attributable" to the state of Tennessee. *Brentwood Academy,* 180 F.3d at 766. In the case here, there remain questions of fact as to whether the

actions of the VHSL are "so intertwined" with the state that their actions should be considered state actions, or whether the actions of the VHSL are "fairly attributable" to the Commonwealth of Virginia.

The United States Supreme Court has not addressed the issue of whether a state high school athletic association is a state actor. In *NCAA v. Tarkanian*, however, in which the Supreme Court concluded that the NCAA is not a state actor, the Court added a footnote that stated: "The situation would, of course, be different if the membership [of the athletic organization] consisted entirely of institutions located within the same state, many of them public institutions created by the same sovereign." 488 U.S. 179, 194 n. 13, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

The defendant also argues that this court should grant summary judgment to the VHSL as to the plaintiffs' Equal Protection claim because they have failed to forecast any evidence that the VHSL promulgated or reaffirmed its scheduling rules; thus, there was no intentional discrimination. The defendant contends that the VHSL's rules resulting in the alleged Equal Protection discrimination are facially gender neutral. The defendants point to the VHSL Handbook as evidence that the league has established "a mechanical population-based formula for assigning schools every two years to a group of like-sized schools" and a method of determining sports seasons by setting playoffs in the season when the majority of the schools play that sport. (Def's. Mem. Supp. Mot. Summ. J. at 25.)

However, questions of fact exist regarding this argument. The plaintiff has presented evidence in the form of the deposition of Mr. David Nelson that the VHSL season alignment evolved because administrators attempted to fit girls' sports schedules around the already existing schedules of boys' sports, which it did not alter. (*See* Nelson Dep. at 39–40.) Both the defendant and the plaintiff are likely to present expert testimony at trial in regards to this point. The jury will have to assess the evidence and decide issues of credibility. It is within the province of the jury to decide whether the VHSL promulgated or reaffirmed gender-biased scheduling rules, thus intentionally causing discrimination.

At this time, this court declines to decide whether the VHSL is a state actor for the purposes of § 1983. Multiple issues of material fact remain to be decided at trial, such as whether the actions of the VHSL are fairly attributable to the state or sufficiently intertwined with actions of the state, whether the VHSL promulgated or reaffirmed gender-biased scheduling rules, thus intentionally causing discrimination and whether the VHSL's alleged unequal treatment of high school girls' sports with regard to the scheduling of seasons is substantial. Therefore, the plaintiffs' motion for declaratory judgment, construed as a motion for partial summary judgment, is denied, and the defendant's motion for summary judgment is denied.

### D.

MOTION IN LIMINE

The plaintiffs have asked this court to exclude from admission into evidence the survey conducted by the Center for Survey Research on behalf of the VHSL. The plaintiffs give two reasons for this motion: (1) the court should not admit the survey because it is being submitted for an improper purpose, that is, for use in the liability portion of the case, and (2) the survey constitutes inadmissible hearsay.

The plaintiffs assert that the use of a survey is proper only after a determination that the defendant is in violation of Title IX. They cite *Cohen v. Brown*, a First

Circuit case, for the proposition that statistical evidence is not to be used to determine whether there has been a violation of the law, but is to be used to determine what to do about such a violation. 101 F.3d 155 (1st Cir.1996). The defendants, on the other hand, assert that surveys are properly used in conducting investigations into potential violations of Title IX and cite the OCR's Title IX Athletics Investigators Manual as support and therefore is properly submitted as evidence.

The plaintiffs' Title IX claim falls under the "scheduling of games and practice time" category as defined in the Title IX Policy Interpretation. *See* Intercollegiate Athletics Policy Interpretation, 44 Fed. Reg. 71,413 (1979). The VHSL is liable under this aspect of Title IX if the plaintiffs can prove that the genders were deliberately treated unequally with regard to the scheduling of games and practice times. Because this is an equal treatment case, the survey is important because it serves to show whether girls program-wide view this difference in treatment—that is, the difference in scheduling boys' and girls' seasons—as a problem warranting change.

The plaintiffs also allege that the survey should be excluded because it is inadmissible hearsay under Federal Rule of Evidence 801, which defines hearsay as "[a] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801. The plaintiffs also allege that the survey was developed and conducted in a biased manner because the Center for Research is affiliated with the University of Virginia, which also used to house the VHSL, and because the questions were loaded with inferences.

Although the survey meets the definition of hearsay in that it consists of out-of-court statements of girls who have not been identified, and who will not be available for cross-examination at trial, the defendant argues that several hearsay exceptions apply. The defendant's argument that the survey is not hearsay because it is being offered to demonstrate that VHSL had a nondiscriminatory basis upon which to make its decision not to align the girls' sports seasons is without merit. The survey was not conducted until after the lawsuit was filed. Therefore, the results of the survey cannot be offered as the reason why the VHSL did not align the girls' sports seasons prior to the filing of the lawsuit.

Federal Rule of Evidence 803(3) excludes from the hearsay rule statements of the declarants' then existing state of mind. The survey results reflect the state of mind of the female high school athletes in Virginia regarding the sports seasons. This is a critical issue because the plaintiff's Title IX claim is an equal treatment claim under the "scheduling of games and practice time" category. The survey might serve to show whether girls view this difference in treatment as a problem warranting change. In *Schering Corp. v. Pfizer*, 189 F.3d 218 (2nd Cir.1999), the Second Circuit recently decided that a survey is admissible into evidence for the purpose of showing a group's impressions. The court in *Schering* allowed a scientific survey to be admitted into evidence for the purpose of showing a group of doctors' state of mind. *Id.* at 227–30. The survey in the present case is therefore properly admissible under Rule 803(3) for the purpose of establishing the high school girls' then existing state of mind, that is, how they feel about the scheduling of girls' and boys' sports.

The survey results also form the basis of expert testimony and therefore is admissible under Federal Rule of Evidence 703.

Rule 703 states that facts or data, which need not be otherwise admissible in evidence, upon which an expert bases an opinion or inference, may be those perceived by or made known to the expert at or before the hearing. *See* FED. R. EVID. 703. Among other things, this rule is intended to offer a basis for ruling on the admissibility of opinion polls and surveys, as long as valid techniques are employed. Advisory Committee Notes to 1972 Proposed Rules of Evidence. VHSL expects to call two expert witnesses at trial who will base their opinions, in part, upon the survey.

The plaintiffs' motion in limine is denied.

## IV.

For the foregoing reasons, the defendant's motion for summary judgment is denied, the plaintiff's motion for declaratory judgment, construed as a partial motion for summary judgment, is denied, and the plaintiffs' motion in limine is denied. An appropriate order, shall, this day, issue.

## ORDER

Before the court is the defendant's August 2, 1999 "Motion for Summary Judgment," the plaintiffs' August 2, 1999 "Motion for Declaratory Judgment," and the plaintiffs' August 2, 1999 "Motion in Limine to Exclude Evidence." The defendant seeks for this court to grant summary judgment as to both claims found in the plaintiffs' complaint. The plaintiffs ask the court to find that the Virginia High School League is an entity subject to liability under Title IX of the Education Amendments and that it is a "state actor" within the meaning of the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1983. The plaintiffs also seek to exclude from admission into evidence the survey conducted by the Center for Survey Research on behalf of the Virginia High School League. After a careful consideration of these motions, the parties' responses, and a hearing, it is, for the reasons stated in the attached memorandum opinion, hereby

### ADJUDGED AND ORDERED

that the defendant's motion for summary judgment shall be, and it hereby is, DENIED, the plaintiffs' motion for declaratory judgment, construed by this court as a motion for partial summary judgment shall be, and hereby is, DENIED, and the plaintiffs' motion in limine shall be, and hereby is DENIED.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record.